# In the United States Court of Federal Claims

No. 09-691C

(Filed: October 12, 2010)

| | |
|---|---|
| ***************************************** * | |
| * | |
| INTERNATIONAL INDUSTRIAL PARK, INC. * | |
| et al., * | |
| * | Subject Matter Jurisdiction; |
| * | Coverage of Contract Disputes |
| Plaintiffs, * | Act; Failure to Submit Claim to |
| * | Contracting Officer; Definition of |
| v. * | "Procurement;" Exemption for |
| * | "Real Property in Being." |
| THE UNITED STATES, * | |
| * | |
| Defendant. * | |
| * | |
| ***************************************** * | |

*Roger J. Marzulla*, with whom was *Nancie G. Marzulla*, Marzulla Law, LLC, Washington, DC, for Plaintiffs.

*Corinne A. Niosi*, with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Bryant G. Snee*, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for Defendant.

OPINION AND ORDER
ON DEFENDANT'S MOTION TO DISMISS

WHEELER, Judge.

Before the Court is Defendant's June 16, 2010 motion to dismiss Plaintiffs' complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). The case involves an August 6, 2008 barter contract in which Plaintiffs agreed to relocate an easement on their property for the benefit of the United States in exchange for the Government's agreement to pave and improve two access roads on the relocated easement. Plaintiffs contend that Defendant never built the roads promised under the contract, and that Defendant repudiated the contract on August 14, 2009. Plaintiffs filed suit on October 14, 2009 seeking damages in excess of $5 million.

Defendant asserts in its motion to dismiss that the contract, if a contract at all, is governed by the Contract Disputes Act, 41 U.S.C. §§ 601-613 (2006) (the "CDA"). Under the CDA, contractors must submit a certified claim to the contracting officer for final decision before filing suit in this Court. 41 U.S.C. §§ 605, 609. Since Plaintiffs failed to submit a claim, Defendant argues that the Court must dismiss Plaintiffs' suit for lack of subject matter jurisdiction.

On June 30, 2010, Plaintiffs opposed Defendant's motion to dismiss, contending that the contract is not covered by the CDA. Plaintiffs assert that the contract is not a "procurement" under the CDA, and that the easement to be relocated is "real property in being," which is exempt from the CDA. 41 U.S.C. § 602(a). Defendant filed a reply on August 26, 2010, arguing that Plaintiffs' definition of "procurement" is too narrow, and that the alleged contract is for a new easement, which is not "real property in being." The Court heard oral argument on September 16, 2010.

For the reasons stated below, the Court denies Defendant's motion to dismiss. The Court finds that the contract does not pertain to a new easement, but rather is for the relocation of an existing easement, which is "real property in being" and therefore exempt from the CDA. When the parties entered into the contract, an easement known as the 1990 Otay Truck Trail easement already existed. The purpose of the contract was to relocate this easement and provide paved roads for improved access. The Court also finds that the contract is not a "procurement" under the CDA because Defendant has not acquired any property by entering into the contract. Accordingly, Plaintiffs were not obligated to submit a CDA claim to the contracting officer before filing suit.

Factual Background[1]

Plaintiffs International Industrial Park, Inc., KYDDLF & RDLFGFT No. 1, LLC, and Rancho Vista Del Mar, own parcels of land in the Otay Mesa area of San Diego County, California, near the Mexican border. (Compl. ¶¶ 1-3.) These entities are owned and controlled by the Roque De La Fuente family. Id. ¶ 4. Representatives of the United States Border Patrol enter these and other adjacent parcels of land on a daily basis to repel or apprehend illegal aliens crossing the border from Mexico. Id. ¶ 6. Plaintiffs and the De La Fuente family have been engaged in litigation with the United States for several years on the issue of whether the Border Patrol's patrolling and use of the property constitute a Fifth Amendment taking. See Otay Mesa Prop. L.P. v. United States, 93 Fed. Cl. 476 (2010); Otay Mesa Prop. L.P. v. United States, 86 Fed. Cl. 774 (2009); D&D Landholdings v. United States, 82 Fed. Cl. 329 (2008); Int'l Indus. Park v. United States, 80 Fed. Cl. 522 (2008). To assist with its mission, the Border Patrol since

---

[1] The facts described in this Opinion do not constitute findings of fact by the Court. The facts cited herein are either undisputed or alleged and assumed to be true for the purposes of the pending motion.

1990 has had an access easement over Plaintiffs' property to the Otay Truck Trail, a government-owned road. (Compl. ¶ 7.)

The 1990 access easement is difficult and dangerous to traverse. Id. Therefore, in 2008, the parties negotiated an agreement entitled "Department of Homeland Security Right-of-Entry for Construction," which vacates the 1990 easement and creates a modified easement alignment. Id. Ex. A. In the contract, Plaintiffs grant the Government an easement over their land in consideration for the Government agreeing to pave and improve two access roads, "the Kuebler Ranch Road" and "the proposed north-south road." Id. ¶ 7. These roads would be used by the Border Patrol to protect the U.S./Mexico border, and by the landowners to access their property. Id. The contract is only four pages long, and has two additional pages of exhibits. Id. Ex. A. The contract does not contain any reference to the CDA, and does not describe how disputes would be resolved. Id. The title to the contract references the "Department of Homeland Security," but the contract is signed by the "Chief, Real Estate Division, U.S. Army Corps of Engineers, Albuquerque District." Id. The contract does not identify any government representative as being a "contracting officer." Id. The sole reference to any statute or regulation is in the title of the contract, which identifies the "Secure Fence Act of 2006." Id. There are no standard government contract clauses that typically would appear in a federal procurement. Id. Except for the use of one dollar as consideration, the contract contains no dollar amount as payment. The agreement simply is that Plaintiffs will grant Defendant a modified easement in exchange for two paved and improved roads. Id.

The Government did not perform the contract. Id. ¶ 9. On August 14, 2009, the Government informed Plaintiffs that it would not perform, but gave no excuse for its non-performance. Id. On August 24, 2009, Plaintiffs sent a letter to the U.S. Army Corps of Engineers demanding performance. Id. ¶ 10. Plaintiffs' complaint alleged that the Government responded to this letter. Id. However, at oral argument, counsel for both parties agreed that there had been no response. (Tr. Oral Arg., Sept. 16, 2010, at 20, 23.) Because there is no evidence of a government response at this stage, the Court will not assume its existence.

<u>Standard for Review</u>

If the Government raises the issue of jurisdiction, the plaintiff then bears the burden of establishing jurisdiction. Lechliter v. United States, 70 Fed. Cl. 536, 543 (2006) (citing Myers v. United States, 50 Fed. Cl. 674, 680 (2001)). In ruling on a motion to dismiss, the Court must accept as true all the facts in the complaint, and construe the facts in the light most favorable to the plaintiff. Harbuck v. United States, 58 Fed. Cl. 266, 267 (2003) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)), aff'd, 378 F.3d 1324 (Fed. Cir. 2004). If a jurisdictional fact is in dispute, the Court may consider relevant evidence to resolve the factual issue. Rocovich v. United States, 933

F.2d 991, 994 (Fed. Cir. 1991) (citing Reynolds v. Army and Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988)). The complaint should not be dismissed unless the plaintiff fails to show any set of facts that would entitle the plaintiff to relief. Hamlet v. United States, 873 F.2d 1414, 1416 (Fed. Cir. 1989) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

Discussion

   A. Type of Easement

As a preliminary matter, the parties disagree about the type of easement described in the contract. Defendant characterizes the agreement as creating a new easement, (Def.'s Mot. Dismiss 5), while Plaintiffs say that the contract provides for the relocation of an existing easement. (Pls.' Opp'n 2.) The Court agrees with Plaintiffs, and finds that the contract is for the relocation of an easement. Although reading individual segments of the contract might allow for an inference that Plaintiffs are granting Defendant a new easement, the contract as a whole makes clear that the parties contemplated the relocation of an easement. See Granite Constr. Co. v. United States, 962 F.2d 998, 1003 (Fed. Cir. 1992) (citing B.D. Click Co. v. United States, 614 F.2d 748, 753 (Ct. Cl. 1980)) ("It is well settled that a contract must be interpreted when possible as a whole in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions."). Paragraph 10 of the contract states that the parties will simultaneously extinguish the 1990 easement and create the new easement alignment depicted in Exhibit 1. (Compl. Ex. A.) The map attached to the contract as Exhibit 1 provides the clearest evidence of the parties' intent. The map shows that the 1990 easement is being relocated to a paved set of roads, but just like the 1990 easement, the roads will connect to the Otay Truck Trail. Id. The parties thus were eliminating one access route to the Otay Truck Trail, and creating another access route via the paved roads. While paragraph 10 provides for the simultaneous termination of one easement and the creation of another, the map attached to the contract vividly depicts the easement relocation. To give a reasonable meaning to every section of the contract, the Court must read the contract as providing for the relocation of an easement.

   B. Applicability of the CDA

The CDA does not apply to this right-of-entry contract. It is axiomatic that not every government contract falls under the CDA. E.g., Coastal Corp. v. United States, 713 F.2d 728, 730 (Fed. Cir. 1983) ("The scope of the [CDA] thus is limited to express or implied contracts for the procurement of services and property and for the disposal of personal property. It does not cover all government contracts."). For transactions involving property, the CDA applies to "any express or implied contract . . . entered into by an executive agency for – (1) the procurement of property, other than real property in being." 41 U.S.C. § 602(a). Thus, in order for a contract to be covered by the CDA, the

4

contract must be a "procurement" of property and it cannot be for "real property in being." Id. The contract here does not meet either of these requirements.

1. Procurement

To determine if the contract is one for the procurement of property, the Court must consider two sources of information. First, the Court will examine the definition of "procurement" to see if the term encompasses this contract. Second, following the case law from the Federal Circuit, the Court will look to the purpose and legislative history of the CDA.

a. Definition

The term "procurement" is not defined in the CDA. The term is, however, defined in the Office of Federal Procurement Policy Act, 41 U.S.C. §§ 401-440 (2006) (the "Policy Act"). The Policy Act established the Office of Federal Procurement Policy within the Office of Management and Budget (41 U.S.C. § 404), and authorized it to prescribe government-wide regulations for procurement contracts including "the procurement of – (1) property other than real property in being." 41 U.S.C. § 405. Since the phrases establishing coverage for the procurement of property are identical in the Policy Act and the CDA, the Court can rely upon the Policy Act to interpret this portion of the CDA. See Forman v. United States, 767 F.2d 875, 878-879 (Fed. Cir. 1985) (finding that because the CDA and Policy Act cover the same contracts, the court could rely on the legislative history of the Policy Act to interpret the phrase "real property in being" in the clause "the procurement of property, other than real property in being"). See also Lublin Corp. v. United States, 84 Fed. Cl. 678, 681 (2008) (using the Policy Act definition of procurement to define procurement under the CDA).

The contract here is not a procurement as defined by the Policy Act. The Policy Act defines procurement as "all stages of the process of *acquiring* property or services . . . ." 41 U.S.C. § 403(2) (emphasis added). The Government did not acquire any property or services by entering into the contract with Plaintiffs. To "acquire" means "to gain possession or control of; to get or obtain." Black's Law Dictionary 26 (9th ed. 2009). The definition of "acquire" denotes the acquirer obtaining something that it would not have had absent the contract. For the Government to acquire property through a contract, it must have the property as a result of the contract. In this case, the Government already possessed an easement providing access to the Otay Truck Trail, even if it had not entered into the present contract. Thus, the Government did not acquire anything by entering into the contract; it merely made a change to a property right it had procured many years earlier. See Roberta B. v. Tenet, 71 Fed. App'x 45, 47 (Fed. Cir. 2003) (holding that an agreement covering an agency employee's travel and relocation expenses was not a contract "for procurement of services" covered by the CDA because plaintiff "was already within [the agency's] employ and had been for many years.").

b. Purpose and Legislative History of the CDA

While the definition of "procurement" is a sufficient basis for this Court to find that the parties' contract does not fall under the CDA, other courts have looked to the legislative history and purpose of the CDA to analyze whether a contested contract should be covered by the CDA. Institut Pasteur v. United States, 814 F.2d 624 (Fed. Cir. 1987); G.E. Boggs & Assocs. v. Roskens, 969 F.2d 1023 (Fed. Cir. 1992); Lublin Corp, 84 Fed. Cl. 678; Bailey v. United States, 46 Fed. Cl. 187 (2000); Ervin and Assocs. v. United States, 44 Fed. Cl. 646 (1999). In the seminal case, Institut Pasteur, the Federal Circuit held that, while the language of 41 U.S.C. § 602(a) is unambiguous, interpretation may be necessary if applying the statute on a purely linguistic level "does not do justice to the realities of the situation." 814 F.2d at 627 (quoting Texas State Comm'n for the Blind v. United States, 796 F.2d 400, 406 (Fed. Cir. 1986)). A court must look to the purpose and legislative history of the CDA to determine if applying the CDA to a contract was within the intention of Congress. Id. Using the Federal Circuit's analysis to construe the contract here, the Court finds that the contract is not covered by the CDA.

In Institut Pasteur, a French laboratory sent samples of Lymphadenopathy Associated Virus (LAV), believed by the laboratory's scientists to be the cause of AIDS, to scientists at the National Cancer Institute (NCI) on the condition that NCI not disseminate the virus or use it for industrial or commercial purposes. Id. at 625-26. When a dispute arose because NCI scientists patented their own AIDS diagnostic kit, Pasteur filed suit in the United States Claims Court. Id. at 626. As in this case, Pasteur had not submitted a certified claim to the contracting officer, and the question of jurisdiction turned on the issue of whether the contract was covered by the CDA. Id.

To determine the purpose of the CDA, the Federal Circuit in Institut Pasteur looked at two sources of legislative history. First, the Federal Circuit explained that the CDA was the implementation of the recommendations of the Commission on Government Procurement. Id. at 627. The purpose of this Commission was:

> [To] promote economy, efficiency, and effectiveness in the procurement of goods, services and facilities by and for the executive branch of the Federal government by – (1) establishing policies, procedures, and practices which will require the Government to acquire goods, services, and facilities of the requisite quality and within the time needed at the lowest reasonable cost, utilizing competitive bidding to the maximum extent practicable . . . .

Id. (quoting Pub. L. No. 91-129, § 1, 83 Stat. 269, as amended by Pub. L. No. 92-47, 85 Stat. 102). The Federal Circuit also quoted a portion of the Senate Report on the CDA:

> Both [the economy of our society and the success of many major government programs] can be affected by the existence of competition and quality contractors – or by the lack thereof. The way potential contractors view the disputes-resolving system influences how, whether, and at what prices they compete for Government contract business.

Id. (quoting S. Rep. No. 1118, 95th Cong., 2d Sess. (1978), *reprinted in* 1978 U.S. Code Cong. & Admin. News 5235, 5238).

After reviewing this legislative history, the Federal Circuit found that the policy concerns relating to cost and competition had no application to the contract for the LAV samples because the LAV contract merely defined how scientists were to deal with these samples as part of a collaborative research effort. Id. The Federal Circuit then sought to determine the necessary elements for a "procurement." Id. To do so, it looked to the Federal Procurement Regulations,[2] where it found "an emphasis on a buyer-seller relationship and an expenditure of government funds." Id. In the contract between NCI and Institut Pasteur, there was no buyer or seller and no obligation on the part of the Government to expend funds. Id. at 628.

Relying on the Institut Pasteur analysis, the Court here finds that applying the CDA to the parties' contract does not do justice to the realities of the situation. The contract does not have a clear buyer or a clear seller. The parties reached an agreement that accommodated both of their needs. If the contract had been performed, the Government would have had a better and safer route by which to access the Otay Truck Trail, and Plaintiffs would have had a road with which to access their property. Rather than a buyer-seller agreement, this contract is more akin to a collaborative effort between the Government and Plaintiffs to make the best use of the property. See Bailey, 46 Fed. Cl. at 211 ("The alleged agreement appears to have been more of a collaborative effort between the government and [plaintiff] . . . rather than a standard procurement of goods and services subject to the CDA.").

The cost and competition objectives of the CDA also have no application to this contract. The Federal Circuit, in a case following Institut Pasteur, explained that it could exclude a contract from the CDA because "[t]he policy rationale behind the Contract Disputes Act, designing an efficient disputes resolution system to encourage quality

---

[2] Although the Court has some reluctance in giving weight to analysis based on regulations no longer in existence, the Court will do so here because several cases following Institut Pasteur have used Institut Pasteur's buyer-seller analysis to determine if a contract is covered by the CDA.  See e.g., Pinnavaia v. United States, No. 00-5068, 2000 WL 1673664, at *2 (Fed. Cir. Nov. 6, 2000) (finding that "the CDA is applicable to contracts for the procurement of property or services, which are typified by a buyer-seller relationship" and finding that informant agreements do not arise in that context); Ervin & Assocs., 44 Fed. Cl. at 654 (finding that the relationship between the plaintiffs and [the defendant] "was plainly a buyer-seller relationship – not one of collaborative partners").

contractors to competitively provide goods and services to the U.S. [G]overnment, is neither impaired nor promoted by excluding [this] contract from the Act." G.E. Boggs & Assocs., 969 F.2d at 1028. Similarly, in this case, the policy goals of the CDA will be neither promoted nor impaired by not applying the CDA to the contract. The agreement resulted from a negotiation between two parties regarding property in which they both have a continuing interest. The contract itself does not utilize or contemplate any of the usual procurement procedures; there is no mention of any procurement regulations, and more specifically, there is no mention of the CDA. To be candid, Defendant's assertion of a CDA defense strikes the Court as a litigious afterthought never contemplated for a single moment by the parties. Because this contract is part of an on-going "give and take" between two parties regarding property they both use, taking this contract outside of the CDA will have no effect on the competition and cost objectives of the CDA. [3]

### 2. Real Property in Being

As a final point supporting the Court's conclusion, the contract here is one for relocation of an existing easement and thus is for "real property in being." The CDA applies to "the procurement of property, other than real property in being." 41 U.S.C. § 602(a)(1). The distinction between a contract for property, which is covered by the CDA, and a contract for real property in being, which is not covered by the CDA, is whether there is a property interest in existence before the Government enters into the contract. The Federal Circuit in Forman v. United States, 767 F.2d at 879, interpreted legislative history and concluded that real property in being "refers to the procurement of existing interests – fees, easements, leases, etc. – and not the initial creation of these interests." The Federal Circuit held that by entering into a previously non-existent lease, the Government acquired a new property interest and the CDA therefore applied. Id. Similarly, in Salt River Pima-Maricopa Indian Community v. United States, the Court found that entering into an easement was not a contract for real property in being. 86 Fed. Cl. 607, 615 (2009). In doing so, the Court stated that "the government did not acquire a pre-existing easement. The document signed by the parties created a new relationship, in this case for a previously undefined easement." Id. at 614. The Court explained that prior to the contract, "no such property interest existed at the site in question and, therefore, was not 'in being.'" Id. at 615. These cases establish two categories of contracts, those for existing property interests, and those in which the Government acquires a new property interest.

In the present case, Plaintiffs and the Government did not create a new property interest. The parties had an existing relationship through the 1990 easement that grants

---

[3] Oroville-Tonasket Irrigation Dist. v. United States, 33 Fed. Cl. 14, 23 (1995), criticizes Institut Pasteur for implying that the CDA did not cover all "all contracts within the categories set forth in 41 U.S.C. § 602(a)." The Court found that sole-source contracts were covered by the CDA. This Court does not dispute the holding that sole-source contracts may be covered by the CDA, but finds that the collaborative nature of the contract takes it outside of CDA coverage.

the Government access to the Otay Truck Trail.  (Compl. ¶ 7.)  The property interest already existed.  The contract, therefore, is for real property in being and is excluded from the CDA.

## Conclusion

The parties' contract is not covered by the CDA because it is not a "procurement" under the CDA, and because it is a contract for real property in being.  Thus, the Court has jurisdiction over this matter even though Plaintiffs did not submit a claim to the contracting officer.  Based on the foregoing, Defendant's motion to dismiss is DENIED.  The parties are directed to proceed with the pretrial schedule established in the Court's May 26, 2010 order.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge