# In the United States Court of Federal Claims

No. 09-691C

(Filed: October 7, 2011)

```
*****************************************  *
                                          *
                                          *
INTERNATIONAL INDUSTRIAL PARK, INC.,      *
et al.,                                   *
                                          *
                    Plaintiffs,           *
                                          *
v.                                        *
                                          *
THE UNITED STATES,                        *
                                          *
                    Defendant.            *
                                          *
*****************************************  *
```

Barter Contract; Government Construction of Road in Exchange for Easement; Interpretation of Contract; Plain Meaning Rule; Reasonableness; Mutual Assent; Defenses of Rescission, Waiver, and Equitable Estoppel Rejected; Expectancy Damages.

*Roger J. Marzulla*, with whom was *Nancie G. Marzulla*, Marzulla Law, LLC, Washington, D.C., for Plaintiffs.

*Corinne A. Niosi*, with whom were *Gregg P. Yates*, Trial Attorney, *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Bryant G. Snee*, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

Plaintiffs, International Industrial Park, Inc., KYDDLF and RDLFGFT No. 1 LLC, and Rancho Vista Del Mar, are landowners in the Otay Mesa area of San Diego County, California. Plaintiffs (or "Landowners") contend that the Government breached a contract in which it promised to build a road across Plaintiffs' property. During the negotiations over the contract and the post-contract dispute, the Landowners became embroiled in litigation in this Court over the Government's use of their land to patrol the border between the United States and Mexico. See Otay Mesa Property L.P. v. United States ("Otay Mesa I"), 86 Fed. Cl. 774 (2009). They sought compensation in a Fifth

Amendment takings action.  The attorney representing the Government in that phase of the litigation was Ms. Susan Cook of the U.S. Department of Justice.

The parties entered into a contract, called "Department of Homeland Security Right-of-Entry for Construction" ("the contract" or "ROE-C") on August 6, 2008.  The contract provided for the Landowners to give the Government (1) a one-year right-of-entry to construct two (eastern and western) access roads across the Landowners' property to the border, in exchange for the payment of one Dollar and (2) an easement along the western access road in exchange for the permanent improvement of that road to "County specifications standards."  The ROE-C also provided for the Government to extinguish a preexisting easement that the Landowners conveyed to it, which no longer would be necessary to patrol the border in light of the new arrangement.  The contract included an exhibit ("Exhibit 1"), which mapped the alignment of the improved road and listed the requirements for a "County specifications" road in an inset box.  Mr. David Wick, Plaintiffs' agent, signed the ROE-C on July 31, 2008.  Mr. John Baker, the contracting officer for the U.S. Army Corps of Engineers ("the Corps") and Chief of the Real Estate Division for the Albuquerque District, signed it on August 6, 2008.

In the fall of 2008, Ms. Cook and Mr. Wick entered into various contentious discussions concerning the agreed scope of construction for the road improvements.  Ms. Cook asserts that during the course of those discussions, Mr. Wick said he no longer wanted the alignment set forth in the contract.  In contrast, Mr. Wick merely remembers suggesting a new alignment after Ms. Cook said the Government did not have the budget to meet all specifications under the original alignment.  After December 2008, the parties began negotiating a new alignment but never reached an agreement.

On August 14, 2009, Government officials met with Mr. Wick and told him that the Government would not perform under the contract.  On August 24, 2009, Mr. Wick wrote a letter demanding performance.  The Government never responded.  Plaintiffs filed a complaint in this Court on October 14, 2009.

The Government initially challenged this Court's jurisdiction over Plaintiffs' claims, arguing that the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601-613 (2006) (current version at 41 U.S.C. §§ 7101-7109), covered the August 6, 2008 agreement, and that Plaintiffs did not comply with CDA jurisdictional prerequisites.  The Court denied Defendant's motion to dismiss on October 12, 2010, holding that the CDA did not apply to the ROE-C.  See Int'l Indus. Park, Inc. v. United States, 95 Fed. Cl. 63 (2010).

In the instant matter, the parties dispute the scope of the road improvement obligation created under the ROE-C.  Defendant argues that the contract created no construction obligation.  Further, even if it did create a construction obligation, Defendant argues that the contract is not enforceable because there was no meeting of the minds as to the obligation's scope.  On the one hand, the Landowners believe that the

improved road has to meet all the requirements of a public road, which could be dedicated to San Diego County. On the other hand, the Government believes that the scope of improvement is limited to the specific elements listed in the inset box of Exhibit 1 to the contract. Finally, Defendant contends that the Government is not in breach of its obligation because the Landowners rescinded or waived their rights under the ROE-C. Defendant also contends that equitable estoppel justifies relief for the Government because the Landowners' actions materially prejudiced it.

The Court held a four-day trial in Washington, D.C. from April 12 through April 15, 2011. During trial, the Court received the testimony of twelve witnesses, three of whom were experts. The parties filed post-trial briefs on June 14, 2011 and reply briefs on July 14, 2011. The Court heard closing arguments on August 9, 2011.

In brief summary, the Court finds that the parties signed an enforceable contract with a construction obligation on August 6, 2008. However, the scope of road improvement is limited to the requirements actually specified in the contract, in the inset box of Exhibit 1. The record does not demonstrate that Plaintiffs ever rescinded or waived their rights under the contract, nor does equitable estoppel justify relief for the Government. Plaintiffs are entitled to damages for the cost of constructing an improved road consistent with the elements specifically listed in the inset box. Based upon the estimation of Defendant's expert, the Landowners therefore are entitled to $1,708,185 in damages.

Factual Background[1]

A. <u>The Landowners' Prior Litigation and Early Negotiations to Resolve the Present Conflict</u>

Plaintiffs in this case, International Industrial Park, Inc., KYDDLF and RDLFGFT No. 1 LLC, and Rancho Vista Del Mar are owners of parcels of land in the Otay Mesa area of San Diego County, California. (Stip. ¶ 1-3.) Plaintiffs are owned by the De La Fuente family of San Diego, California. (Stip. ¶ 4.) Plaintiffs International Industrial Park, Inc. and Rancho Vista Del Mar, as well as several other entities owned by the De La Fuente family, brought suit in this Court in 2006 seeking just compensation for the Office of Border Patrol's ("Border Patrol's") taking of their property. See Otay Mesa I, 86 Fed. Cl. 774. The Border Patrol had been using Plaintiffs' property since the 1970s to detect and apprehend illegal aliens crossing into the United States from Mexico. Id. at

---

[1] This Factual Background constitutes the Court's principal findings of fact under Rule 52(a) of the Court. Other findings of fact and rulings on mixed questions of fact and law are set forth later in the Discussion.

775.  The plaintiffs in <u>Otay Mesa</u> alleged that the Border Patrol effectuated a taking by patrolling the plaintiffs' property on foot and in vehicles 24 hours per day, assuming stationary positions on the plaintiffs' property from which they monitored and responded to illegal alien activity, creating new roads without the Landowners' permission, installing underground motion-detection sensors, and constructing a permanent tented structure from which agents responded to radio calls from station headquarters.  <u>Id.</u>  The Court issued a decision on liability on May 5, 2009, finding that the statute of limitations barred most of the plaintiffs' claims but, as the Government stipulated, there had been a taking of easements over the plaintiffs' property due to the installation and use of the underground sensors.  <u>Id.</u> at 785-91.  The Court awarded damages of $3,043,051 on June 30, 2010.  <u>See</u> <u>Otay Mesa Property L.P. v. United States</u> ("<u>Otay Mesa II</u>"), 93 Fed. Cl. 476 (2010), <u>appeal</u> <u>docketed</u>, No. 2011-5002 (Fed. Cir. Oct. 1, 2010).

While litigation over the takings claim was ongoing, the parties began to discuss the possibility of the Landowners granting the Government an easement in exchange for an improved road.  <u>See</u> (Cook, Tr. 554-55.)  The Border Patrol uses both Alta Road and the Otay Truck Trail in its work.  (Pena, Tr. 370-71.)  Plaintiffs' land lies between the two roads, and the Border Patrol requires access across Plaintiffs' property to reach the Otay Truck Trail from Alta Road.  (Wick, Tr. 105-06; Pena, Tr. 352-53; PX 199.)  In 1990, Mr. Roque De La Fuente granted the United States, through the Bureau of Land Management ("BLM"), an easement across an unimproved (unpaved) stretch of the Landowners' property from Alta Road to the entrance to the Otay Truck Trail.  (Stip. ¶ 11; Wick, Tr. 112, 207-09.)  However, there is a blind spot at the Alta Road entrance of the BLM easement and, therefore, it is not entirely safe or functional to use the BLM easement to access the Otay Truck Trail.  (Wick, Tr. 113-14.)  As a result, the Border Patrol would cut across the De La Fuentes' property in other areas.  <u>See</u> (Wick, Tr. 105-06.)  That practice created friction between the Border Patrol and Plaintiffs.  (Wick, Tr. 109-12.)

In mid-2007, Ms. Cook, the attorney representing the Government during the takings litigation, entered into discussions with Mr. De La Fuente about the possibility of supplementing the BLM easement.   (Cook, Tr. 554-56.)   The Government would construct an improved road along a safer and more functional route in exchange for an easement along that route.  <u>See</u> (Cook, Tr. 555-57.)  Mr. De La Fuente's agent, Mr. Wick, began more advanced negotiations with Mr. Oscar Pena in the fall of 2007.  (Wick, Tr. 216.)   Mr. Wick is the president of National Enterprises and its subsidiary SD Commercial, LLC, management companies that own and develop properties throughout the country, including the Landowners' properties.  (Wick, Tr. 90-91.)  Mr. Pena was the Acting Assistant Chief for Tactical Infrastructure for the Border Patrol from July 2007 through May 2009.  (Pena, Tr. 347.)  His job was to ensure that the Border Patrol's operational requirements were met.  He did not have final approval authority for an agreement to build a road.  (Pena, Tr. 376-77.)

Mr. Wick and Mr. Pena met in October 2007 to discuss a route that would run perpendicular to the Donovan State Prison, a route which they called "Alignment 1." (Wick, Tr. 219-20); see also (DX 5.)  After their meeting, Mr. Wick sent an email to Mr. Pena on October 17, 2007 stating, "Attached are the County's road standards."  (JX 4.) Attached to that email were: (1) the cover page of the "Public Road Standards, County of San Diego Department of Public Works;" (2) a page from the Public Road Standards that defines "Industrial/Commercial Collector Road;" and (3) a section of a letter from San Diego County to Alta Consultants (Plaintiffs' engineer), describing the County's requirements to dedicate a road.  Id.  Mr. Wick testified that although not directly stated in the text of his email, his purpose in sending the email was to provide Mr. Pena with direction as to the necessary specifications of the improved road, which the Landowners planned to dedicate to the County.  See (Wick, Tr. 118-19.)  Mr. Pena forwarded the attachments to three other officials.  See (JX 5.)  On November 1, 2007, approximately two weeks after his first email, Mr. Wick sent a second email to Mr. Pena and Ms. Cook, among others, suggesting a second alignment.  See (DX 6.)

B.  The PF-225 Project

As Mr. Wick negotiated access across Plaintiffs' property with Mr. Pena and Ms. Cook, the U.S. Customs and Border Protection ("CBP") identified a portion of the border with Mexico within the San Ysidro Mountains, referred to as "the A-1" segment, for the erection of several miles of pedestrian fencing.  (Stip. ¶ 14; Flossman, Tr. 522.)  The Border Patrol is the law enforcement arm of the CBP, which itself is a component of the U.S. Department of Homeland Security.  (Stip. ¶¶ 5-6.)   The Border Patrol was responsible for identifying areas across the border, like the A-1 segment, where there was a need for "persistent impedance."  (Flossman, Tr. 520, 522.)  The Facilities Management and Engineering Organization ("FMNE"), another component of the CBP, is an organization that provides solutions for the Border Patrol once it has identified a requirement.  (Flossman, Tr. 517-20.)  The FMNE's solution for providing persistent impedance along the A-1 segment was to erect a pedestrian fence.  (Flossman, Tr. 519-20.)

The A-1 segment is part of the "Pedestrian Fence 225" (or "PF-225") project. (Flossman, Tr. 521-22.)   The PF-225 project, itself a part of the broader "Border Infrastructure System," involves the erection of 225 miles of pedestrian fence and infrastructure in various locations along the southwestern border of the United States. (Stip. ¶ 14.)

In addition to identifying areas of persistent impedance, the Border Patrol also was responsible for conducting landowner outreach to gain access to the burgeoning fence. (Flossman, Tr. 523-25.)  The FMNE also coordinated with the Border Patrol to ensure that nothing the former did to facilitate constructing the fence would harm the latter's ability to conduct enforcement operations.  (Flossman, Tr. 525.)  Loren Flossman is the

Director of the Program Management Office for Border Patrol Facilities and Tactical Infrastructure at the FMNE. (Flossman, Tr. 517-18.) Mr. Flossman testified that Mr. Pena was in charge of outreach to local landowners, such as Mr. De La Fuente, at the time of the A-1 segment negotiations. See (Flossman, Tr. 525.)

The CBP worked with the Corps to provide real estate and construction services for the actual building of the fence. (Stip. ¶ 15.) Specifically, the CBP worked with the Corps to determine how and where to erect the fence. (Flossman, Tr. 523.) The two organizations also worked together on writing requests for proposals ("RFPs") and on source selection. (Flossman, Tr. 524.) The Corps awarded the contracts and oversaw the work of contractors. Id. For the PF-225 project, the U.S. Secretary of Homeland Security delegated the authority to enter into real estate transactions on the CBP's behalf to the Corps. (Stip. ¶ 16.)

To construct a fence along the A-1 segment, the CBP preferred to have access from both the east and the west. (Flossman, Tr. 525-26.) On January 22, 2008, the Corps issued an RFP "for the Design-Build, Construction of Monument 250 Roadway and Primary Border Barrier Fence, San Diego County, California, RFP No. SANUR-08-0002." (Stip. ¶ 17); see also (JX 9.) Mr. William Miller, at the time a senior project manager for the Corps' Programs and Project Management Division, supervised the RFP process. (Miller, Tr. 646, 648.) The RFP provided for the design and construction of an access road to the border barrier fence site with access from one of two options: from the east under "Option 1" and from the west, across Plaintiffs' property, under "Option 2." (Stip. ¶ 17); see also (Miller, Tr. 647; JX 9.) The RFP included, as "Appendix X," the same "Public Road Standards" documents that Mr. Wick had included in his October 17, 2007 email to Mr. Pena. Compare (JX 4), with (JX 9.) The RFP also included a schematic diagram illustrating the path of the A-1 segment as of the issuance of the RFP. See (Miller, Tr. 648-50.) The Corps knew this configuration was not final and that it likely would have to go back to its customer, the FMNE, to revise its budget on account of modifications. See (Miller, Tr. 650-52, 655.) The Corps ultimately accepted a $57,139,195 proposal from Granite Construction ("Granite") and awarded Granite the contract on May 27, 2008. (Stip. ¶ 18); see also (JX 29.) Granite's proposal included $2,094,000 for "the design and construction of culvert crossings, low water crossings, and roadway grading for Monument 250 Road located on Otay Mountain, San Diego County, California," $53,213,000 for "the design and construction of primary border barrier fence and construction access roadway" (collectively, Option 1), and $1,832,195 for "[t]he design and construction for a west access road from Alta Road to Otay Truck Trail" (Option 2). (Stip. ¶ 18); see also (JX 25.)

C. Contract Negotiations Between the Landowners and the Government

Mr. Wick maintains that, after their initial meetings in the fall of 2007, the Border Patrol did not keep Plaintiffs "in the loop" concerning decisions about constructing an

improved access road to replace the BLM easement.  (Wick, Tr. 233.)  On April 16, 2008, Mr. Wick emailed Mr. Pena and Ms. Cook, stating that he had received a telephone call from a potential contractor bidding on the January 22, 2008 RFP.  (Wick, Tr. 234); see also (DX 10.)  Before receiving that call, Mr. Wick did not know that the road across Plaintiffs' property would be a component of the larger PF-225 project.  See (DX 10) ("What was interesting about yesterday's call is that apparently the scope of work for the Project has been expanded to include the building of an access road from Alta Road to the Otay Truck Trail.").

As part of his April 16 email, Mr. Wick sent Mr. Pena and Ms. Cook a third alignment, which he believed would have the least adverse impact on the Landowners' property.  (Wick, Tr. 236-38); see also (DX 10.)  The parties ultimately agreed to that third alignment, which is known for the purposes of this case as "Alignment 4."  See (Wick, Tr. 192; Miller, Tr. 679.)  Ms. Trudy Vinger, a realty specialist with the Los Angeles District of the Corps, also participated for the Government in the negotiations, along with Mr. Miller.  (Vinger, Tr. 733-34, 736-37); see also (Miller, Tr. 668.)

On May 13, 2008, Mr. Wick met with Government officials, including Mr. Pena and Mr. Miller, at the Alta Cafe in San Diego County.  (Wick, Tr. 239; Miller, Tr. 658.)  The parties discussed an agreement-in-principle and walked along the actual proposed alignment.  (Wick, Tr. 240; Miller, Tr. 658.)  At that meeting, Mr. Wick said the improved road should be "60-foot wide with asphalt, curbs, sidewalk and appropriate drainage."  (Miller, Tr. 659.)  The next day, Mr. Wick sent an email to Mr. Pena memorializing the May 13 meeting.  See (JX 27.)  He included an attached map setting out the final alignment.  See id.  In his email, Mr. Wick stated that the first segment of the road "will be built to County standards," the second segment "will be two paved lanes with shoulders and drainage," and the third segment "will also be two paved lanes with shoulders and drainage, but no curbs, gutters or sidewalks."  Id.  On the attached map, Mr. Wick made notes indicating that the first two segments would be to County standards and the third segment would be "two lane, fully paved, no curbs or darts."  (Wick, Tr. 244); see also (JX 27.)

During trial, Mr. Wick testified that he never told the Government officials what he specifically meant by the term "county standards."  (Wick, Tr. 130-31.)  Instead, he sent the October 17, 2007 email with the Public Road Standards attachments and visually showed Mr. Pena what the Landowners expected.  (Wick, Tr. 131.)  At trial, Mr. Wick explained that the Landowners needed the road improved to County standards because they expected to dedicate it to San Diego County.  (Wick, Tr. 131-32.)  The only way that San Diego County would accept a dedication was if the road were built to its standards and specifications.  (Wick, Tr. 132.)

On July 3, 2008, Ms. Cook sent Mr. Wick a draft of an agreement that the Corps had composed.  (Stip. ¶ 22); see also (JX 35.)  The draft stated that the road would be

built to "County specifications standards." (JX 35.) On July 7, 2008, Mr. Wick sent the draft back to Ms. Cook with his edits. See (JX 36.) Mr. Wick added two pages of text to the draft, including an attorney's fees provision. (Cook, Tr. 570); see also (JX 36.) He also added a provision for the Government to vacate the existing BLM easement. See (JX 36.) Ms. Cook forwarded Mr. Wick's edits to other Government officials, including Mr. Pena and Ms. Vinger. See (Cook, Tr. 572-73.) Mr. Wick's attorneys made edits to the document as well. See (DX 24.)

The Corps returned a revised draft to Mr. Wick, which Mr. Wick and Ms. Cook further revised in his office. (Cook, Tr. 574-75); see also (JX 74.) Specifically, concerning attorney's fees, Ms. Cook explained to Mr. Wick that the Landowners could not be awarded attorney's fees unless there were a waiver of sovereign immunity; therefore, Ms. Cook and Mr. Wick changed the paragraph to allow for attorney's fees only as provided by law. (Cook, Tr. 575-76); see also (JX 74.) The parties also exchanged another draft of the agreement. See (Cook, Tr. 577; DX 94.)

On July 25, 2008, Ms. Cook sent Mr. Wick an updated draft of the Exhibit 1 map. See (DX 28.) This version of Exhibit 1 first included the inset box, which showed a drawing of a typical San Diego County road section and listed five elements under the heading, "County spec road includes": "(1) asphalt concrete pavement; (2) Portland cement concrete curb & gutter; (3) sidewalk; (4) street lights, if applicable; (5) striping." Id. The Government added the inset box to ensure that the contract defined "County spec road." (Miller, Tr. 668-69.) Mr. Miller instructed Baker Engineering to prepare the inset box, which Baker Engineering based on Mr. Miller's conversations with Mr. Wick about the definition of "county road." (Miller, Tr. 669, 722-23.) On July 28, Mr. Wick responded to Ms. Cook with his changes to the map, but he made no changes to the inset box. See (DX 28.)

D. The August 6, 2008 Contract

On behalf of the Landowners, Mr. Wick signed the final version of the ROE-C on July 31, 2008; Mr. Baker, the contracting officer for the Corps, signed it on behalf of the Government on August 6, 2008. (Stip. ¶ 24); see also (JX 39.) The Preamble to the contract states:

> The undersigned, hereinafter called the "Owner," in consideration of payment of the sum of One Dollar and the work herein to be performed, to be paid by the UNITED STATES OF AMERICA, hereinafter called the "Government," for all land or easement rights hereinafter described in Exhibit 1, (the property), hereby grants to the Government, a right-of-entry upon the following terms and conditions:

(JX 39.)  Paragraph 1 of the ROE-C explains that the owner gives an irrevocable right to enter the lands described in Exhibit 1 to the Government at any time for a period of twelve months "in order to perform work related to the construction and maintenance of two (2) access roads . . . to be constructed to County specifications standards, and paving that portion of the Otay Truck Trail as shown in Exhibit 1."  Id.  Paragraph 7 describes the new easement to be conveyed to the Government: "In consideration of the construction of the permanent improvement described in Paragraph 1 above, owner hereby agrees to convey to the Government, easements as set forth in Exhibit 2, in, upon, over and across those tracts of land depicted in Exhibit 1."  Id.  Paragraph 7 also imparts that the Government will provide the "[m]etes and bounds descriptions of the easements tracts to be conveyed to the Government."  Id.  Paragraph 10 requires that the parties execute documents as necessary to vacate the original BLM easement and to create the new easement depicted in Exhibit 1.  Id.

The ROE-C also has two attached exhibits.  The final Exhibit 1 depicts the agreed alignment of the improved access road.  Id.  It includes the inset box with the section headed "County spec road includes," listing the same five elements: "(1) asphalt concrete pavement; (2) Portland cement concrete curb & gutter; (3) sidewalk; (4) street lights, if applicable; (5) striping."  Compare id., with (DX 28.)  Exhibit 2 is a description of the easement to be provided to the Government.  (JX 39.)

E.  Post-Contractual Disagreement and Negotiations

On September 10, 2008, the Corps sent a letter to Granite notifying it that the Corps would be exercising Option 2.  (Miller, Tr. 669); see also (JX 41.)  On October 3, 2008, Mr. Wick met with representatives of Granite and the Government.  (Wick, Tr. 177.)  Mr. Wick testified that he told the representatives of the Government the road had to be built to County standards, and it was the responsibility of the Government to go to the County to ensure compliance with those standards.  (Wick, Tr. 180.)  Granite sent a letter to the Corps on October 6, 2008 about the meeting, stating:

> During this discussion it became clear that the scope of work that Mr. Wick had in mind was different than the RFP or our proposal.  According to Mr. Wick, Granite would Design and Install; a new underground electric line, lighting, water main, relocation of back flow preventer, Fire protection lines / hydrants, coordination with power company, coordination with water company, all permits and fees associated with the design and construction of the new utilities.

(JX 43.)

On November 13, 2008, the Corps learned that if Granite were to incorporate the additional elements into the road improvement, as Mr. Wick insisted, construction would cost $2.32 million, about $520,000 more than estimated.  See (JX 47.)  Also on November 13, Mr. Wick emailed Mr. Pena, stating that he had not heard back from anyone involved in building the road for over a month and inquiring about the project's status.  (JX 45.)  On November 17, 2008, Ms. Cook and Mr. Miller participated in a conference call with various other Government officials involved in the project.  See (Miller, Tr. 705-07.)  The purpose of the call was to present a breakdown of the $520,000 in additional funds required.  (Miller, Tr. 706.)  Ms. Cook remembers that in the course of this meeting, the Corps asked her if she would contact Mr. Wick on its behalf and negotiate a resolution as to the meaning of "County Standards."  (Cook, Tr. 583-84.)  Mr. Miller, in contrast, does not recall anyone on the phone call asking Ms. Cook to call Mr. Wick.  (Miller, Tr. 707.)  After the phone call, with Mr. Flossman's approval, Mr. Miller began to draft a change management request ("CMR"), asking the FMNE for $520,000 in additional funding for the project.  (Flossman, Tr. 533; Miller, Tr. 680.)  However, Mr. Miller never circulated the CMR because the Government officials instructed him to incorporate a different route instead.  (Miller, Tr. 719.)

Ms. Cook called Mr. Wick on November 18, 2008.  (Wick, Tr. 184; Cook, Tr. 584.)  Here too, the parties have contrasting memories as to the content of their conversation.  Mr. Wick remembers Ms. Cook saying that the Government did not have enough money to meet the contractual road improvement requirements.  (Wick, Tr. 184-85.)  Therefore, he suggested an alternative alignment.  (Wick, Tr. 185.)  They discussed returning to the alignment perpendicular to Donovan State Prison (Alignment 1), and Ms. Cook told Mr. Wick that she would get back to him.  Id.

Ms. Cook, on the other hand, remembers calling Mr. Wick to say that she understood there was a dispute concerning the meaning of "County Standards."  (Cook, Tr. 584.)  She then merely acknowledged that the road was getting "awfully expensive."  (Cook, Tr. 585.)  Mr. Wick then suggested returning to Alignment 1.  Id.  Ms. Cook denies telling Mr. Wick the Government could not afford to build the road from the ROE-C, in that or any subsequent conversation.  See (Cook, Tr. 600.)

After her November 18 conversation with Mr. Wick, Ms. Cook asked the Corps to determine how much money the Government would save by returning to Alignment 1.  (Cook, Tr. 586.)  The Corps analyzed the two alignments and determined that returning to Alignment 1 would cost an additional $405,000, compared with $520,000 from incorporating the additional elements into Alignment 4.  (Miller, Tr. 687-88.)

On December 2, 2008, after the Corps had determined that returning to Alignment 1 would not save much incremental money, Mr. Wick and Ms. Cook spoke again.  See (Cook, Tr. 589-92.)  The contents of that conversation also are in dispute.  Ms. Cook remembers telling Mr. Wick that Alignment 1 was not much cheaper; they then began to

argue about the additional elements under Alignment 4.  (Cook, Tr. 591-92.)  Ms. Cook testified that Mr. Wick said the Landowners no longer were interested in Alignment 4 because they could not fully develop along that alignment.  (Cook, Tr. 591.) Archaeological concerns had emerged, which would require some land to be left as open space. (Cook, Tr. 592.)  Ms. Cook recalls Mr. Wick saying that if the Government would agree to return to Alignment 1, the Landowners would pay for fire hydrants and water lines.  Id.; see also (JX 53.)

Mr. Wick remembers merely trying to convince Ms. Cook to convey to the Corps that Alignment 1 would be cheaper because: the Landowners already had graded along it, the route had no archeological mitigation costs, and the Landowners already had installed laterals for water, sewer, and dry utilities.  (Wick, Tr. 321-22.)  Mr. Wick denies telling Ms. Cook that the Landowners did not want Alignment 4, as identified in the contract. (Wick, Tr. 186.)  He also denies telling her that there were remaining archaeological concerns requiring land to be left as open space.  (Wick, Tr. 186-87, 202-03, 321-22.)

On December 5, 2008, Ms. Cook sent an email to Mr. Wick and his attorneys on the status of the post-contractual negotiations.  See (Cook, Tr. 593-94.)  The email stated:

> The engineers at the Corps of Engineers are in the processing [sic] of submitting a recommended change order to management at Customs and Border Protection, recommending/requesting that the Otay Truck Trail access road be located along the alignment we've referred to as Alignment 1 (attached) and that the necessary funding be allocated to complete the road.  This is the alignment that you have indicated to me that you prefer.  I expect quick and favorable action on this request.
>
> Accordingly, the Corps' Real Estate Attorneys and I are in the process of redrafting and updating the previous Right of Entry to this new Alternative.

(JX 55.)  Ms. Cook concluded the email, "Please let me know right away if you have any questions, or if I have stated anything incorrectly."  Id.  She never received a direct response from Mr. Wick or his attorneys, who had received copies.  (Cook, Tr. 595.)

Whatever the nature of the exchanges between Ms. Cook and Mr. Wick, the result was that, by early December 2008, the Corps understood Mr. Wick no longer was interested in pursuing Alignment 4 and instead preferred Alignment 1.  (Miller, Tr. 689) ("[I]n the case of Alternative 1, we had an understanding that Mr. Wick supported that particular choice and that he was no longer interested in pursuing Alternative 4 as originally agreed to."); (Flossman, Tr. 533) (explaining that he understood the change in alignment as being something the Landowners wanted).  Mr. Miller presented the two

options to Mr. Flossman and the other Government officials in a conference call.  (Miller, Tr. 689.)  The officials informed Mr. Miller that if Alignment 1 was both less expensive and what the Landowners wanted, then the Corps should agree to return to Alignment 1.  (Miller, Tr. 689.)  Mr. Miller changed the draft CMR to reflect the change in alignment and the additional $405,000 in funding.  (Miller, Tr. 691-92.)  Mr. Flossman signed the CMR in December 2008.  See (JX 57.)  Because the Government believed that the parties would have to agree to an entirely new right-of-entry reflecting the change, Ms. Vinger waited to complete or act on the signed CMR.  See (Vinger, Tr. 742-44.)

Despite agreeing on Alignment 1, the parties could not agree on the length of the preexisting BLM easement to be vacated under their revised bargain.  (Wick, Tr. 194; Flossman, Tr. 535-36.)  At trial, Mr. Michael Hance, a Border Patrol Operations Officer, testified that under Alignment 4 from the August 6, 2008 ROE-C, the Border Patrol would have had access to canyons it needed for enforcement operations.  (Hance, Tr. 796-98.)  Under Alignment 1, however, the Border Patrol would not have access; therefore, the Government no longer could vacate the full BLM easement.  (Wick, Tr. 194; Hance, Tr. 796-98.)  Mr. Flossman understood Mr. Wick to state that a failure to vacate the full BLM easement would be a "deal breaker;" thus, the parties reached an impasse. (Flossman, Tr. 535-36.)

On August 14, 2009, Mr. Wick and his colleague Ms. Lindsay Arobone, an asset manager for SD Commercial, met with various Government officials, including Mr. Brett Koerting, Mr. Bijan Nooranbakht, and Mr. Eric Eldridge, in Mr. Wick's office; Ms. Vinger attended telephonically.  (Wick, Tr. 197-98.)  The officials explained that the Border Patrol had instructed them to stop the road improvement project. (Wick, Tr. 199.)  Mr. Wick became angry and threatened to sue.  (Wick, Tr. 200.)  On August 24, 2009, Mr. Wick sent a letter to the Corps entitled, "Demand for Performance of August 6, 2008 Contract."  (Stip. ¶ 33); see also (PX 150.)  The Government did not respond to that letter. (Stip. ¶ 34.)

Consequently, the Government decided not to exercise Option 2 in its separate agreement with Granite.  (Riley, Tr. 810.)  Mr. James Riley, then an office engineer for the Corps, prepared and negotiated a change order.  (Riley, Tr. 808-09.)  The Government was entitled to a credit of $190,000 from Granite for Option 2.  (Riley, Tr. 810, 814.)  However, the Government had to reimburse Granite for the additional costs that Granite would incur in building the border fence without access from the west.  See (Riley, Tr. 811-12.)  The Government estimates that the additional costs it incurred because Granite did not have access across Plaintiffs' property amounted to $463,564. (Def.'s Post-Trial Br. 23); see also (Riley, Tr. 812.)  Furthermore, Granite already had completed all design work by the time Option 2 was deleted, as well as preliminary work, such as the stabilization of slopes and "Sewer Moderation Prevention programs."  (Riley, Tr. 813.)  On balance, the Government reimbursed Granite approximately $1.6 million for a road that never was constructed.  (Riley, Tr. 814.)

F. Expert Testimony at Trial

Plaintiffs presented two expert witnesses at trial. Ms. Cynthia Eldred testified as an expert on San Diego County land use. See (Eldred, Tr. 44, 59.) Ms. Eldred has been an attorney for over twenty years. See (Eldred, Tr. 45.) Twenty percent of her practice is real estate and 80 percent is land use. (Eldred, Tr. 46.) Most of her work is in San Diego County. (Eldred, Tr. 45-46.) Ms. Eldred testified as to what would be required to build the road per Plaintiffs' understanding of "County specifications standards." See generally (PX 163.) She determined that the improved access road described in the ROE-C would have to be "a 68-feet width Non-Circulation Element Industrial/Collector Road under the roadway classifications and standards of the County of San Diego." Id. at 5. Ms. Eldred identified three applicable documents: "(1) the 2007 East Otay Mesa specific plan; (2) the 1999 public roads standards; and (3) the 1998 County department of public works procedural manual." (Eldred, Tr. 65.) Ms. Eldred said that a road not meeting all of the specifications she described could be constructed but, unless the road met all of the specifications, the County would not approve or accept it as a public road. (Eldred, Tr. 83-84.)

On the cost of building the road, Plaintiffs presented the expert opinion of Mr. Leslie Knight. Mr. Knight qualifies as an expert in construction cost estimation and management in San Diego County. See (Knight, Tr. 395.) At the time of trial, he had approximately 39 years of construction experience in the San Diego area, including about six years with Granite. See (Knight, Tr. 382, 386-88.) Mr. Knight estimated that the total cost of building the road would be $4,071,633.22. (Knight, Tr. 408-09; see also (PX 162 § 2.1, at 2.) To make his estimate, he relied on the plans of Alta Consultants, one of the Landowners' primary engineers for the development of their property. (Knight, Tr. 476.) Alta Consultants designed its plans based on Plaintiffs' understanding of "County specifications standards." (Pls.' Post-Trial Br. 23) ("The Alta Consultants plans represent the road designed according to San Diego County road standards."). In requesting his expert report, Ms. Arobone wrote Mr. Knight a memorandum. See (DX 83.) In it, she instructed: "This cost estimate will need to contemplate the project's cost from start to finish, including but not limited to biological mitigation, archeological, construction costs, engineering fees, construction management, permits, bidding, etc., i.e. 'the whole enchilada.'" Id.

The Government's expert on the cost of building the road was Mr. Chad Hutchison. Mr. Hutchison also qualifies as an expert in construction cost estimation and management. See (Hutchison, Tr. 826.) He had approximately nineteen years of pertinent experience at the time of trial and provides training courses in best estimation principles. See (Hutchison, Tr. 816, 826.) To reach his opinion, Mr. Hutchison reviewed plans that Granite had created for the construction of the Alignment 4 road. (Hutchison, Tr. 827-28.) He estimated the total cost of the improved road at $1,708,185. (DX 98.)

For the elements that both Mr. Knight and Mr. Hutchison estimated, Mr. Knight priced those common elements at $1,586,199, $121,986 less than Mr. Hutchison priced them. (DX 114.)

Discussion

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach." San Carlos Irrigation and Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). Plaintiffs assert that the August 6, 2008 ROE-C is a legally binding contract. (Pls.' Post-Trial Br. 26.) Under the ROE-C, the Government had an obligation to construct an improved road to "County specifications standards." Id. at 29. Plaintiffs argue that the Government breached the August 6, 2008 contract; it "never built any road" and "never executed the documents necessary to extinguish the BLM easement." Id. at 27. When representatives from the Government told Mr. Wick on August 14, 2009 that they would not construct the road, and then ignored his subsequent, written demand for performance, the Government thereby breached the contract. Id. at 33-36. Plaintiffs therefore assert that they are entitled to damages of $4,071,633.22, the cost of constructing an improved road to all San Diego County specifications and standards. Id. at 51-52.

Defendant makes several contentions as to why it has no responsibility at all under the ROE-C. The Government asserts that the ROE-C did not contain a construction obligation. (Def.'s Post-Trial Br. 30-34.) It also asserts that the parties did not have the necessary meeting of the minds on a material term of the contract and, absent a meeting of the minds, there is no enforceable agreement. Id. at 30, 34-37. Defendant then argues that even if there were the necessary mutual assent for a contract with a construction obligation, Mr. Wick rescinded or waived the Government's obligation through his actions. Id. at 30, 37-41. Based on this argument of rescission or waiver, Defendant finally asks the Court "to apply the doctrine of equitable estoppel to prevent plaintiffs' change in position from materially prejudicing the Government." Id. at 30, 41-43.

The Court finds that the record does not support Defendant's contentions in its efforts to avoid contractual liability. The Court finds that there was a sufficient meeting of the minds, such that the August 6, 2008 ROE-C is an enforceable contract with a construction obligation. The Court also finds that the evidence does not show Mr. Wick ever rescinded or waived his rights under the contract. However, the Court does agree with the scope of the construction obligation that Defendant proposes. As Defendant states, the ROE-C obliges the Government to construct an improved road, built consistent with the elements listed in the inset box. Despite Plaintiffs' contentions, the contract does not require the Government to meet all of the standards and specifications necessary to dedicate a public road to San Diego County. By never building any road, and then repudiating its obligation in August 2009, the Government breached the ROE-C.

Accordingly, Plaintiffs are entitled to damages for breach of contract, but damages are limited to the cost of meeting only those road improvement elements specifically listed in Exhibit 1 to the contract.

### A. The ROE-C Contains a Construction Obligation.

Defendant argues that the ROE-C contained no construction obligation. (Def.'s Post-Trial Br. 30.) Rather, Defendant submits that the contract gave the Government an irrevocable right to enter the Landowners' property for twelve months from the date of the instrument to construct the two access roads to the border. Id. at 32. To Defendant, Paragraph 1 of the ROE-C sets out the permissible grounds upon which Defendant could exercise its right but does not impose obligations on it. Id. at 32-33. Defendant interprets Paragraph 7, which states, "In consideration of the construction of the permanent improvement described in Paragraph 1 above, owner hereby agrees to convey to the Government, easements as set forth in Exhibit 2," as dictating only Plaintiffs' future obligation to convey an easement in the event that the Government improves the road along it. Id. at 33. Defendant is similarly dismissive of the Preamble, explaining that the Preamble grants the Government a right to enter "upon the following terms and conditions" and that none of those terms and conditions requires the construction of the improved road. Id. at 34.

Contract interpretation starts with the agreement's "plain language." Forman v. United States, 329 F.3d 837, 842 (Fed. Cir. 2003) (quoting McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996)). "[P]rovisions of a contract must be . . . considered as a whole and interpreted so as to harmonize and give meaning to all of its provisions." Arizona v. United States, 216 Ct. Cl. 221, 575 F.2d 855, 863 (1978) (internal citations omitted). The Court should avoid an interpretation that "leaves a portion of [the contract] useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." Id.

The Court finds that the plain meaning of the contract requires the Government to construct an improved road. The Preamble of the ROE-C states:

> [T]he 'Owner,' in consideration of payment of the sum of One Dollar and the work herein to be performed, to be paid by . . . the 'Government,' for all land or easement rights hereinafter described on Exhibit 1, ('the property'), hereby grants to the Government, a right-of-entry upon the following terms and conditions.

(JX 39.) Thus, the Preamble sets out the consideration that the Landowners are to receive in exchange for the right-of-entry to construct the two access roads. The grant of the right-of-entry for one Dollar is conditioned on a secondary exchange: an easement to

access the border from the west via the Otay Truck Trail, in exchange for the permanent improvement of the newly servient land. Without the easement for road exchange, no right-of-entry is granted. The Government's interpretation reads out of the ROE-C the language set forth in the Preamble, making the Preamble superfluous. Such an interpretation is untenable under the longstanding <u>Arizona v. United States</u> precedent. The contract contains a construction obligation.

### B. The Parties Had a Meeting of the Minds to Construct the Road Consistent with the Improvements Listed in the Inset Box.

The Government argues that there is no enforceable contract because there was no mutual assent as to the scope of the road construction improvements, an essential term in the ROE-C. (Def.'s Post-Trial Br. 30, 34-37.) At the time Plaintiffs entered into the contract, they believed "County specifications standards" meant the Government would construct an improved road, which could be dedicated to San Diego County, and that the Government would go to the County to ascertain what its standards were. (Wick, Tr. 120-21, 131-33.) The Government, in contrast, understood "County specifications standards" to be limited only to those elements specifically listed in the inset box. (Miller, Tr. 668-69.) Defendant asserts that this disagreement compels the Court to discharge it of all responsibilities under the ROE-C.

Courts are disinclined to find a contract wholly unenforceable because there was no meeting of the minds. <u>Consumers Ice Co. v. United States</u>, 201 Ct. Cl. 116, 475 F.2d 1161, 1165 (1973) (stating Courts generally will not find that no contract existed on account of no meeting of the minds "if there is any reasonable means of giving effect to the contract at issue"); <u>Can. Life Assurance Co. v. Guardian Life Ins. Co. of Am.</u>, 242 F. Supp. 2d 344, 356 (S.D.N.Y. 2003) ("Not every misunderstanding between the parties following execution of an agreement could possibly void a contract, since almost any contractual dispute is based on some disappointment of expectations."). Courts will find that there was no meeting of the minds only if the dispute goes to the heart of the contract and there is "no sensible basis for choosing between conflicting understandings." <u>Colfax Envelope Corp. v. Local No. 458-3M</u>, 20 F.3d 750, 753 (7th Cir. 1994) (internal quotations omitted). A party may abandon a contract without liability only where there exists merely an arbitrary basis for deciding whose understanding to enforce because neither party is at greater fault for the misunderstanding. <u>See id.</u> Thus, contract abandonment is not appropriate if one party's understanding is relatively more reasonable. If one party had reason to believe the other party's interpretation of the contract, then the other party's interpretation prevails. <u>See id.</u> at 754.

The Court does not believe that the parties' disagreement about the meaning of the term "County specifications standards" requires it to find that there was no enforceable contract whatsoever. First, the Court finds that the disagreement over the scope of the term's construction does not go to the heart of the ROE-C. The heart of the contract is a

right-of-entry to construct two access roads in exchange for one Dollar, contingent upon a secondary exchange of an easement for the construction of a permanent road improvement along it.  The scope of that improvement is but a lesser detail.  There are many ways in which the parties could have disagreed about the scope of the construction obligation, and the Court will not allow such disagreement to undermine the heart of the bargain.

Second, the parties did not have equally reasonable understandings as to the meaning of the term "County specifications standards."   The Government's understanding was more reasonable.  Mr. Wick states he told Mr. Pena and Ms. Cook that the improved road needed to be built to "San Diego specifications and standards." (Wick, Tr. 123-26.)  At trial, Mr. Wick described how he had communicated the meaning of the term to the Government officials:

> I provided them the front page of a document where one would go to, to get started to find out what the scope of county standard roads entail.  I verbalized to them in various meetings, you know, sidewalks, curbs, gutters, so forth and so on just to give the framework.  And then I gave them a site tour of improvements that we had completed through the County of San Diego not too far from the subject property so they would understand what a collector road entailed to be done in order to be accepted by the county.

(Wick, Tr. 268.)   Based on their conversations with Mr. Wick and with Baker Engineering, Mr. Miller, Ms. Cook, and Ms. Vinger added the inset box to memorialize the definition of "County specifications standards" applicable to the ROE-C.  (Miller, Tr. 668-69.)  The elements listed in the box were consistent with the information Mr. Wick had provided Mr. Pena in his October 17, 2007 email.  Compare (JX 4), with (JX 39.) Given the actual information Mr. Wick had provided, the elements that the Government ultimately listed in the inset box were a reasonable interpretation of the term "County specifications standards."  Therefore, it is reasonable to understand all references in the ROE-C to "County specification standards" as referring to the definition of that term in the inset box.

By contrast, Mr. Wick's understanding of the term is not reasonable.  Mr. Wick interprets "County specifications standards" to mean an improved road that could be dedicated to the County.  There is no written evidence documenting any communication between Mr. Wick and the Government, to demonstrate that he expected the Government to approach the County to ascertain and comply with all specifications necessary to dedicate a public road.  If Mr. Wick believed "County specifications standards" impelled the Government to construct a road that could be dedicated to the County, he should have ensured such a definition was articulated expressly in the ROE-C.  Further, once the

Government added the inset box, Mr. Wick should have been on notice to the fact that the Government believed the scope of construction included only those elements specifically listed. Otherwise, the Government would have added an entirely useless section to the contract, in disregard of the teachings of Arizona v. United States. Finally, if, after seeing the inset box, Mr. Wick continued to believe the definition of "County specifications standards" meant a road that could be dedicated to the County, then there was a patent ambiguity in the contract about which Mr. Wick had a duty to inquire. See Newsom v. United States, 230 Ct. Cl. 301, 676 F.2d 647, 649 (1982). Under the patent ambiguity doctrine, the Government's interpretation of "County specifications standards" prevails because Mr. Wick failed to inquire about the true meaning of an objectively ambiguous term. See Triax Pac., Inc. v. West, 130 F.3d 1469, 1475 (Fed. Cir. 1997).

Plaintiffs posit four arguments, grounded in the text of the ROE-C, as to why only their interpretation of the term "County specifications standards" is reasonable and why the inset box list is not exhaustive: (1) if the inset box wholly defines the elements of the improved road, it would have been headed "specifications for this contract" rather than "County specifications standards," (Pls.' Post-Trial Resp. Br. 13); (2) the capital "C" in "County specifications standards" necessarily implies that the standards to be used are those of the County in which the road is to be built, id. at 26-27; (3) the list is not exhaustive because its heading states, "County Spec Road Includes," and the word "includes" means "[t]o have or take in as a part or member," id. at 13-14 (internal citation omitted); and (4) the phrase "if applicable," after "street lights" in the inset box, indicates that there is at least one other document demonstrating whether street lights are applicable, id. at 14.

The Court does not find these arguments convincing. The elements listed in the inset box all are requirements to dedicate a road to San Diego County. "County specifications standards" could refer to some official County standards without necessarily referring to all of them. Likewise, the word "includes" does not only apply to exhaustive lists; sometimes it is used for non-exhaustive ones. Finally, even if the usage of "if applicable" is problematic, the Court does not understand the phrase to mean automatically that the ROE-C required the Government to meet all of the specifications necessary to dedicate the improved road to the County.

Furthermore, in their response brief, Plaintiffs criticize Defendant's interpretation of "County specifications standards" as making no practical sense. (Pls.' Post-Trial Resp. Br. 41.) Plaintiffs question where utilities would go, how Plaintiffs' lessees, vendors, and customers would access the land, and whether the public could enter the land. Id. These were concerns, however, of the Landowners and not of the Government. As Mr. Pena and Mr. Miller testified, the Government merely needed access across Plaintiffs' property, to the border and the burgeoning fence. See (Pena, Tr. 352-53; Miller, Tr. 647-48.)

Since Defendant had a reasonable understanding of "County specifications standards" and Plaintiffs did not, the Court adopts Defendant's reasonable understanding of the term. Thus, the Government did not have to construct a road conforming to all of the specifications necessary for dedication to San Diego County. However, the ROE-C is enforceable and obliged the Government to construct a road conforming to each of the elements specifically listed in the inset box.

C.  Rescission, Waiver, and Equitable Estoppel Defenses

Defendant argues that even if, as the Court has found, there is an enforceable contract with a construction obligation, there is no liability because Mr. Wick rescinded or waived the Landowners' rights under the ROE-C. (Def.'s Post-Trial Br. 30, 37-41.) Further, Defendant argues that the doctrine of equitable estoppel bars Plaintiffs' claims. Id. at 30, 41-43. All three of these arguments are grounded in the same set of facts, stemming from the December 2, 2008 conversation between Ms. Cook and Mr. Wick. The Government contends that Mr. Wick told Ms. Cook, Plaintiffs no longer wanted Alignment 4 but instead wanted Alignment 1. Id. at 38. It also asserts that Mr. Wick's conduct after the December 2, 2008 conversation demonstrated he no longer treated the ROE-C as remaining operative. (Def.'s Post-Trial Resp. Br. 24.) The Court is not persuaded by these arguments.

1.  Rescission

Where "each party agrees to discharge all of the other party's remaining duties of performance under an existing contract," there is an agreement of rescission. Restatement (Second) of Contracts § 283(1) (1981). "The validity of an agreement to rescind a contract is controlled by the same rules as in the case of other contracts; there must exist an offer by one party and an unconditional acceptance of that precise offer by the other, prior to withdrawal by the offeror, before a binding agreement is born." 29 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 73:15 (4th ed. 1993) (internal footnote omitted). In addition to rescission through writing, contracts may be rescinded orally or through the conduct of the parties. Mont. Bank of Circle, N.A. v. United States, 7 Cl. Ct. 601, 610 (1985) ("Abandonment of a contract is a question of fact that may be shown by a written contract, verbal agreement or by acts and conduct."). Where conduct rescinds a contract, "[t]he acts of the parties must be positive, unequivocal and inconsistent with an intent to be further bound by the contract." Nebco & Assocs. v. United States, 23 Cl. Ct. 635, 642 (1991) (quoting Armour & Co. v. Celic, 294 F.2d 432, 436 (2d Cir. 1961)). Since Defendant asserts rescission, Defendant has the burden of proving that rescission. See Klamath Irrigation Dist. v. United States, 635 F.3d 505, 520 n.12 (Fed. Cir. 2005) ("All else again being equal, courts should avoid requiring a party to shoulder the more difficult task of proving a negative. 'The general rule is that a party that asserts the affirmative of an issue has the burden of proving the facts essential to its claim.'" (quoting Auburndale State Bank v. Dairy Farm Leasing Corp., 890 F.2d

888, 893 (7th Cir. 1989))); Armour & Co., 294 F.2d at 436 ("The termination of a contract is not presumed, and the burden of establishing it rests upon the party who asserts it.").

Defendant's rescission argument is grounded in a statement Ms. Cook remembers Mr. Wick making in their December 2, 2008 phone conversation. See (Def.'s Post-Trial Br. 38.)  According to Ms. Cook, Mr. Wick said, "We're not interested in Alignment 4 any more, we can't develop along it.  There's archeological concerns, and some of it's going to have to be left as open space.  So we'd really like to go back to [A]lternative 1." (Cook, Tr. 591-92.)  Mr. Wick denies telling Ms. Cook that the Landowners required the different alignment, or that archaeological concerns precluded them from fully developing their land along the roadway.  (Wick, Tr. 186-87.)  Rather, Mr. Wick relates suggesting Alignment 1 because the Government had said it did not have sufficient funds to construct Alignment 4 and because he believed the Border Patrol's ingress and egress under Alignment 1 would be less intrusive to the Landowners' use of their property. See (Wick, Tr. 185-86.)

In reviewing the conflicting trial testimony, the Court finds that while Mr. Wick may have expressed a preference for one alignment over the other, his expression of a mere preference did not rise to an offer for rescission.  Even under Ms. Cook's recollection, Mr. Wick's statements did not amount to an unequivocal disavowal of the ROE-C.  He never went so far as to express an intention to dissolve the binding contract between the parties.  Further, there is not a single piece of contemporaneous written evidence showing that Mr. Wick wanted an alignment other than Alignment 4.  Although a contract can be rescinded orally, the Court finds it suspicious that with all of the emails exchanged between Mr. Wick and the Government, Mr. Wick never once mentioned in writing that he was requesting a new alignment or that he no longer wished to be bound by the contractual one.  Indeed, in his contemporaneous writings on the issue, Mr. Wick stated his belief that the parties still had a binding contract. See, e.g., (PX 120) ("We have a signed agreement with the Border Patrol regarding this entire project."); (JX 65.)

Defendant argues that the conduct of both parties shows each acted as if the contract had been abandoned.  (Def.'s Post-Trial Resp. Br. 24, 26-28); see also (Def.'s Post-Trial Br. 40.)  The Government clearly acted as if the contract had been abandoned. Mr. Miller prepared and signed a change management request, which changed the alignment from Alignment 4 to Alignment 1, to accommodate what the Government believed was the Landowners' request.  (Flossman, Tr. 533; Miller, Tr. 680, 698.)  The Government also stopped taking steps to execute the ROE-C; for example, Ms. Vinger did not follow up with the BLM to vacate the preexisting easement because she understood that the Government would have to renegotiate the contract entirely given the change in alignment.  (Vinger, Tr. 742-43.)  However, it is insufficient for Defendant to show only that the Government acted as if the ROE-C had been rescinded; Defendant must show that both parties treated the contract as non-operative. See Armour & Co, 294

F.2d at 437 ("To establish abandonment the evidence must . . . point positively and unequivocally to an intention on the part of both parties to abandon it.").

Defendant relates two instances in which Ms. Cook insinuated that the contract had been rescinded, and Mr. Wick did not quarrel with her statement.  In an email dated December 5, 2008, Ms. Cook told Mr. Wick that she and the Corps were in the process of "redrafting and updating" the previous right-of-entry.  (JX 55.)  Likewise, in an email dated March 4, 2009, Ms. Cook recounted, to a number of Government officials, telling Mr. Wick that the Government would condemn alternative land if the parties could not reach an agreement.  See (JX 62.)  The Court finds that Mr. Wick's apparent silence in both instances is not sufficient to show he unequivocally intended to rescind the ROE-C.

Additionally, Defendant argues that Mr. Wick treated the ROE-C as abandoned after December 2, 2008, when he filed an action for trespass after Government representatives brought construction equipment on to the Landowners' property.  (Def.'s Post-Trial Resp. Br. 24.)  If proven, this argument might be persuasive evidence that Mr. Wick acted as if the contract had been rescinded.  However, Defendant provides no evidence showing that the Government in fact was using the construction equipment in compliance with the contract, or any other evidence on the circumstances surrounding the alleged trespass or Plaintiffs' reasons for filing the trespass action.  For the above reasons, Mr. Wick did not rescind the Landowners' rights under the ROE-C.

## 2. Waiver

"A waiver is an intentional relinquishment of a known right."  A Olympic Forwarder, Inc. v. United States, 33 Fed. Cl. 514, 521 (1995) (internal citations omitted).  A party may "waive any provision, either of a contract or a statute, intended for his benefit."  Shutte v. Thompson, 82 U.S. 151, 159 (1872).  "Waiver requires (1) the existence at the time of the waiver a right, privilege, advantage or benefit that may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage or benefit."  Youngdale & Sons Constr. Co. v. United States, 22 Cl. Ct. 345, 347 (1991) (quoting In re Garfinkle, 672 F.2d 1340, 1347 (11th Cir. 1982)).  "Waivers of rights must be voluntary, knowing, and intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."  Krzeminski v. United States, 13 Cl. Ct. 430, 438 (1987).  "Waiver is an affirmative defense, as to which the breaching party bears the burden of proof."  Westfed Holdings, Inc. v. United States, 407 F.3d 1352, 1360 (Fed. Cir. 2005).

The Government argues that Mr. Wick's suggestion to return to Alignment 1, and his apparent attempts to convince Ms. Cook that the alternative alignment would be cheaper, amounted to a waiver of the Landowners' contractual right to construction under Alignment 4.  (Def.'s Post-Trial Br. 41.)  The Court, however, does not find that this evidence rises to an intentional relinquishment of Plaintiffs' right to have the improved

road constructed at all.  Mr. Wick may have expressed a preference for Alignment 1, but the evidence does not show that he waived the Landowners' right to Alignment 4 in the event the parties could not agree to an alternative arrangement.

### 3. Equitable Estoppel

Equitable estoppel is "administered in favor of one who has been induced to alter his line of conduct with respect to the subject matter in controversy so as to have foregone some right or remedy which he otherwise would have taken." Ralston Purina Co. v. United States, 75 Ct. Cl. 525, 58 F.2d 1065, 1068 (1932).  The doctrine requires a showing of:

> (1) misleading conduct, which may include not only statements and actions but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delayed assertion of such rights is permitted.

Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes, Inc., 971 F.2d 732, 734 (Fed. Cir. 1992) (citing A.C. Aukerman Co. v. R.L. Chaides Const. Co., 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc)).  The Court finds that the facts of this case do not justify equitable estoppel as Defendant was not reasonable in believing that Mr. Wick would not demand performance of the August 6, 2008 ROE-C.  To reiterate, despite discussing a possible alternative alignment, Mr. Wick never stated that he was abandoning his contractual right to Alignment 4.  Defendant's position is even less reasonable in light of Mr. Wick's March 31, 2009 email in which he avowed, "We have a signed agreement with the Border Patrol regarding this entire project" and then added, "We trust that our government will honor it's [sic] agreement with us."  (PX 120.)  Equitable estoppel does not bar Plaintiffs' claims.

### D. Plaintiffs Are Entitled to Damages for the Cost of Constructing an Improved Road Consistent with the Elements Listed in the Inset Box.

The parties agree that the proper measure of damages is expectancy damages, the benefits the non-breaching party expected to receive had the breach not occurred.  See (Pls.' Post-Trial Br. 51; Def.'s Post-Trial Br. 43); see also Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) ("One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred.").  Thus, both parties agree that the amount of damages would equal the cost of constructing the improved road described in the contract.  However, because of their differing interpretations of the term "County specifications standards," the parties offered widely different estimates as to how much it would cost to build that road.

At trial, Plaintiffs presented the expert testimony of Ms. Eldred, who testified as to San Diego County's prerequisites to approve construction and to accept a road for public dedication. (Eldred, Tr. 83-84.) Plaintiffs' damages expert, Mr. Knight, interpreted "County specification standards" to mean a road that could be dedicated to the County. (Pls.' Post-Trial Br. 52.) In his cost estimate, he therefore incorporated all of the elements that Ms. Eldred expressed as prerequisites. See id. at 52-56. Mr. Knight estimated that constructing the road would cost $4,071,633.22. (Knight, Tr. 408-09); see also (PX 162 § 2.1, at 2.)

By contrast, Defendant's expert, Mr. Hutchison, calculated his cost estimate from plans that the contractor Granite had derived only from those elements listed in the inset box of the ROE-C. (Hutchison, Tr. 827-28); see also (DX 122.) Mr. Hutchison estimated that building the improved road would cost $1,708,185. (DX 98.)

For the reasons stated in this opinion, the Court finds that only the Government's interpretation of "County specifications standards" is reasonable. The Court also finds Mr. Hutchison to be a reliable and trustworthy witness. Therefore, the Court will adopt his cost estimate and award Plaintiffs damages of $1,708,185.

Conclusion

Based on the foregoing, the Court finds that Plaintiffs are entitled to recover $1,708,185 in damages due to the Government's breach of the August 6, 2008 ROE-C. The clerk shall enter final judgment against Defendant in that amount. Pursuant to Rule 54(d) of the Court, costs are awarded to Plaintiffs.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge